**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **AMERICAN IMMIGRATION COUNCIL,** |
| **Plaintiff,** |
| **v.** |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY,** *et al.*, |
| **Defendants.** |

**Civil Action No. 11-1972 (JEB)**

## MEMORANDUM OPINION

In March 2011, American Immigration Council submitted a Freedom of Information Act request to Customs and Border Protection, a component agency of the Department of Homeland Security.  AIC sought information about individuals' access to counsel during their interactions with federal immigration authorities.  Dissatisfied with the response to its request – the agency produced just two pages of records after six months of discussion – AIC filed suit in this court against CBP and DHS.  Defendants then conducted a broader search, which ultimately produced at least 156 additional responsive documents.

The merits litigation now completed, AIC moves for an award of attorney fees and costs.  Because Plaintiff substantially prevailed in its suit and the multi-factor entitlement inquiry favors a fee award – at least for a portion of the underlying litigation – the Court will grant its Motion in part.  AIC's requested sum, however, will be reduced to account for various billing-related deficiencies.

I.      **Background**

Past Opinions detail the full background of this suit, so the Court will recount here only the facts relevant to the pending Motion for Attorney Fees.  In March 2011, AIC submitted a FOIA request to CBP asking for:

> [A]ny and all records which have been prepared, received, transmitted, collected and/or maintained by the U.S. Department of Homeland Security and/or U.S. Customs and Border Protection (CBP), whether issued or maintained by CBP Headquarters offices, including any divisions, subdivisions or sections therein; CBP offices at ports of entry, including any divisions, subdivisions or sections therein; and/or any other CBP organizational structure; and which relate or refer in any way to any of the following:
>
> • Attorneys' ability to be present during their clients' interactions with CBP;
>
> • What role attorneys may play during their clients' interactions with CBP;
>
> • Attorney conduct during interactions with CBP on behalf of their clients;
>
> • Attorney appearances at CBP offices or other facilities.

Mot., Exh. B (March 14, 2011, Letter from Emily Creighton to CBP's FOIA Division) at 1 (footnote omitted).  The request "include[d], but [was] not limited to" ten specific types of records.  Id. at 1-2.

After "consult[ing] with several component offices within CBP," the agency's FOIA Division informed Plaintiff that "much of the information" it sought was "already publicly available."  Compl., Exh. C (May 12, 2011, Letter from Dorothy Pullo to Emily Creighton) at 1. The letter further stated that responsive information could be found online in one of three places: the Code of Federal Regulations, the "Personal Search Handbook," or the soon-to-be-released "Inspector's Field Manual."  Id.

Questioning the adequacy of Defendants' search for responsive documents, Plaintiff immediately filed an administrative appeal.  See Compl., Exh. D (May 26, 2011, Letter from Emily Creighton to CBP's FOIA Appeals Division) at 2 ("The May 12, 2011, response merely includes general documents that are publicly available and does not reflect a search reasonably calculated to uncover documents relevant to the guidance outlined in the request.").  Upon receipt of this filing, the Appeals Division contacted three internal offices "in which responsive records were likely to have been created and be maintained" – namely, the Office of the Border Patrol (OBP), the Office of Field Operations (OFO), and the Office of Chief Counsel (OCC).  See id., Exh. F (Sept. 29, 2011, Letter from Shari Suzuki to Emily Creighton) at 10.  The cumulative efforts of those three offices produced just two pages of responsive records.  See id., Exh. G (Excerpts from Agency Guidance Materials).  The agency explained that it was "unable to provide [AIC] with any further information because no such information exists."  See Suzuki Letter at 10.

In November 2011, believing that Defendants had failed to comply with the obligations imposed by FOIA, AIC brought suit in this court.  Shortly thereafter, Defendants filed their first Motion for Summary Judgment, maintaining that the search CBP had conducted was "reasonably calculated to uncover all information responsive to Plaintiff's request."  ECF No. 9 (First Motion for Summary Judgment) at 10.  AIC opposed the Government's Motion, arguing that the agency had failed to adequately justify the limited nature of its search.  See ECF No. 12 (First AIC Opposition).  In particular, Plaintiff noted that Suzuki's Declaration never explained why the three component offices searched were the only ones likely to contain responsive records, and that the Declaration lacked sufficient detail as to the search methods employed.  See id. at 3-8.

AIC also highlighted a number of responsive documents likely to be in CBP's possession that, inexplicably, had not been produced.  See id. at 8-16.

After reviewing Plaintiff's Opposition, Defendants withdrew their Motion.  See ECF No. 18 (Notice of Withdrawal).  Deeming it "in the best interest of this litigation" to "expand their search beyond the CBP offices originally believed to have responsive records," Defendants agreed to "conduct a nationwide search of CBP offices for records responsive to Plaintiff's FOIA request . . .[,] involv[ing] over 300 Ports of Entry, approximately 130 Border Patrol Stations and 20 Border Patrol Sectors, CBP Field Operations Offices as well as the following additional offices at CBP headquarters: Office of Training and Development, Office of Diversity and Civil Rights, Office of Policy and Planning, and Office of Executive Secretariat."  Id. at 2-3.

This ramped-up effort yielded a richer harvest of more than 300 documents, of which the Government subsequently released some in full, disclosed others in part, and withheld still others altogether pursuant to various FOIA exemptions.  See ECF Nos. 20-25, 27-29, 31, 38 (status reports updating the Court on progress of production).  During this period of rolling productions – which occurred between October 2012 and July 2013 – the parties frequently met and conferred regarding the adequacy of Defendants' searches and the propriety of various redactions.  See Mot. at 2.  These conferences bore fruit: the Government subsequently produced certain records with fewer redactions, and AIC determined that it would no longer challenge the adequacy of the search.  See id. at 2-3.  Despite continued negotiations, however, the parties could not reach an agreement on the redactions contained in seven of the documents.  With progress at a standstill, Defendants moved for summary judgment on the remaining documents, which the Court granted on March 21, 2014.  See Am. Immigration Council v. United States Dep't of Homeland Sec. (AIC I), No. 11-1972, 2014 WL 1118353 (D.D.C. Mar. 21, 2014).

Plaintiff now seeks to recover attorney fees and related expenses for the work its attorneys performed prior to Defendants' Second Motion for Summary Judgment.  The parties began negotiating such fees almost a year ago, back in April of 2014.  On August 28, nearly five months after this discussion began and after multiple e-mails and conference calls, Defendants abruptly notified AIC that "[u]pon further reflection," they "do[] not believe [AIC] is entitled to attorneys' fees."  ECF No. 49 (Motion for Briefing Schedule), Att. 1 (Declaration of Melissa Crow), Exh. 8 (August 28, 2014, Letter from Marian Borum).  The letter explained that because AIC had failed to file a motion for fees within fourteen days after the entry of judgment, as required by Federal Rule of Civil Procedure 54(d)(2)(B)(i), "Defendant considers this matter closed."  Id.

Taken aback by the Government's sudden change of heart, AIC immediately filed a Motion to set a briefing schedule to resolve the issue of attorney fees.  See ECF No. 49.  Agreeing with Plaintiff that Rule 54 poses no bar to an attorney-fee award in this case, the Court granted the Motion.  See ECF No. 52 (Memorandum Opinion & Order) (AIC II).  With briefing now complete, the Court turns to the merits of AIC's request.

## II.     Analysis

FOIA provides that courts "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(i); see Brayton v. Office of the U.S. Trade Rep., 641 F.3d 521, 524 (D.C. Cir. 2011).  "This language naturally divides the attorney-fee inquiry into two prongs, which our case law has long described as fee 'eligibility' and fee 'entitlement.'"  Brayton, 641 F.3d at 524 (citing Judicial Watch, Inc. v. Dep't of Commerce, 470 F.3d 363, 368-69 (D.C. Cir. 2006)).  The Court, therefore, first decides whether AIC has

"substantially prevailed" and is therefore "eligible" to receive fees.  See id.; Judicial Watch, 470

F.3d at 368; Negley v. FBI, 818 F. Supp. 2d 69, 73 (D.D.C. Oct. 11, 2011).  If so, the Court must

then "consider[] a variety of factors" to determine whether it is "entitled" to fees.  Brayton, 641

F.3d at 524-25; Judicial Watch, 470 F.3d at 369; Davy v. CIA, 550 F.3d 1155, 1158 (D.C. Cir.

2008).  Put another way, the Court will first determine whether AIC may receive fees; if so, it

will then decide whether it should receive them.  See Brayton, 641 F.3d at 524.  Finally, upon

determining that AIC is both eligible and entitled to fees, the Court must "analyze whether the

amount of the fee request is reasonable."  Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland

Sec. (EPIC I), 811 F. Supp. 2d 216, 237 (D.D.C. 2011).

    A.  Eligibility

    A FOIA "complainant has substantially prevailed" and, consequently, is eligible for a fee

award if it "has obtained relief through either – (I) a judicial order, or an enforceable written

agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if

the complainant's claim is not insubstantial."  5 U.S.C. § 552(a)(4)(E)(ii).  AIC invokes the latter

subsection as the basis for its fee request.  The key question under this aptly named "catalyst

theory" is whether "the institution and prosecution of the litigation cause[d] the agency to release

the documents obtained during the pendency of the litigation."  Church of Scientology of Cal. v.

Harris, 653 F.2d 584, 587 (D.C. Cir. 1981); see also Davis v. DOJ, 610 F.3d 750, 752 (D.C. Cir.

2010) ("FOIA plaintiffs [are] eligible for a fee award if the lawsuit substantially caused the

agency to release the requested records," regardless of whether the plaintiff obtained any court-

ordered relief.).

    To recover fees, "a litigant must . . . show[ ] that the lawsuit was reasonably necessary

and the litigation substantially caused the requested records to be released."  Burka v. HHS, 142

F.3d 1286, 1288 (D.C. Cir. 1998).  Although "the mere filing of the complaint and the

subsequent release of the documents is insufficient to establish causation," Weisberg v. DOJ, 745

F.2d 1476, 1496 (D.C. Cir. 1984), it is nonetheless a "'salient factor' in the analysis."  EPIC I,

811 F. Supp. 2d at 232 (citation omitted); accord Pub. Law Educ. Inst. v. DOJ, 744 F.2d 181,

184 n.5 (D.C. Cir. 1984) ("While the temporal relation between [a] FOIA action and the release

of documents may be taken into account in determining the existence *vel non* of a causal nexus,

timing, in itself or in conjunction with any other particular factor, does not establish causation as

a matter of law.").  If, instead of "the threat of an adverse court order . . .[,] an unavoidable delay

accompanied by due diligence in the administrative process was the actual reason for the

agency's failure to respond to a request, then it cannot be said that the complainant substantially

prevailed in [its] suit."  Church of Scientology of Cal., 653 F.2d at 587.

 In opposing Plaintiff's eligibility for fees, Defendants principally contend that no change

in agency position occurred as a consequence of the litigation.  According to CBP, it has

consistently and "steadfastly" striven to produce responsive records since the moment it received

AIC's FOIA request.  See Opp. at 10-11.  The agency says it made a "good faith effort to search

out material" prior to Plaintiff's initiation of this suit, and its decision to "cast a wider net and

conduct even more searches" upon realizing that additional responsive documents might exist is

consistent with its earlier approach.  See id. at 11.

 The facts, however, speak for themselves – and they do not speak in Defendants' favor.

The agency produced not a single document in response to AIC's initial FOIA request, instead

informing Plaintiff that "much of the information it sought" was publicly available online.  See

Pullo Letter at 1.  Even after Plaintiff filed an administrative appeal, the agency produced a mere

two pages of records, stating that it was "unable to provide [AIC] with any further information because no such information exists."  Suzuki Letter at 2.

It was plainly reasonable for Plaintiff to conclude at that point – in light of CBP's initial response and its subsequent disposition of the administrative appeal – that no further material would be released absent judicial involvement.  Indeed, the agency had emphatically declared in no uncertain terms that no additional responsive material existed.  Cf. Judicial Watch, Inc. v. U.S. Dep't of Justice, 878 F. Supp. 2d 225, 232 (D.D.C. 2012) ("[I]t was reasonable for Judicial Watch to believe that the records would not be unconditionally released absent a lawsuit, given the DOJ's initial invocation of Exemptions 5 and 7 in response to Judicial Watch's FOIA request.").

AIC, accordingly, filed suit.  Even then CBP held fast to its position that it had conducted an adequate search and released all responsive documents, going so far as to move for summary judgment on the issue.  In a Declaration accompanying that Motion, Suzuki again averred that CBP was "unable to provide further responsive information to the Plaintiff because no such information exists."  First Mot. for Summary Judgment, Att. 1 (Declaration of Shari Suzuki) at 10-11.

Not until after AIC filed its Opposition did the Government change its tune.  That is, after Plaintiff expended significant time and energy spelling out the deficiencies in CBP's search efforts, Defendants withdrew their initial Motion for Summary Judgment and agreed to conduct a significantly expanded "nationwide search of CBP offices for records responsive to Plaintiff's FOIA request."  Notice of Withdrawal at 2.  That augmented search, of course, led to the rolling production of over 300 documents, at least 156 of which Defendants admit were directly responsive to AIC's initial request.  See Opp. at 6.

It is baffling – and hardly helpful to their credibility here – that Defendants still adamantly assert that no change in position occurred during the pendency of the litigation.  On the contrary, Defendants' release of at least 156 additional responsive documents manifests a 180-degree reversal from their initial position that no further responsive records existed.  The sequence of events – as well as the Government's representations throughout – makes clear, moreover, that Plaintiff's lawsuit served as a necessary catalyst for the agency's release of this significant body of responsive material.  Indeed, this Court recognized as much in an earlier opinion.  See AIC I, 2014 WL 1118353, at *1 (AIC's "suit apparently prompted Defendants to conduct a more thorough search.").  Because Plaintiff has amply demonstrated that CBP would not have released these spoils absent the threat of an adverse judgment, it has "substantially prevailed" and is eligible for fees.  See Dasilva v. U.S. Citizenship & Immigration Servs., No. 13-13, 2014 WL 775606, at *3 (E.D. La. Feb. 24, 2014) ("[P]laintiff is eligible to receive attorney's fees because this set [of records] was disclosed after approximately five months and, more importantly, after defendant submitted a declaration, sworn under penalty of perjury, to the effect that all documents had already been disclosed and defendant then reconsidered its position after plaintiff moved for summary judgment.").

Not inclined to go gently into that good night, Defendants raise three further objections, none of which has merit.  They first emphasize their substantial efforts to cooperate with Plaintiff after withdrawing their original Motion for Summary Judgment.  See Opp. at 6, 11-12.  The Court applauds, as it did in its previous Opinions, the Government's accommodating conduct and both parties' attempts to narrow the dispute without undue court involvement.  But the fact that Defendants went above and beyond after the filing of suit and an initial round of summary-judgment briefing hardly supplants the inadequacy of their efforts prior to that point.

Defendants' assertion that they emerged victorious on their Second Motion for Summary Judgment, see id. at 12, while indisputably correct, is also beside the point.  To be eligible for fees, a complainant must only substantially – not completely – prevail.  That the Court ultimately acquiesced to Defendants' withholdings in seven documents does not mean that AIC is stripped of its eligibility for fees.  Because Plaintiff's suit caused CBP to release at least 156 responsive records – 154 more than they produced before litigation ensued – AIC "substantially prevailed" as a result of bringing suit.  As mentioned earlier, moreover, Plaintiff does not seek remuneration for the time spent opposing the Government's Second Motion.

Finally, to the extent Defendants invoke the agency's good faith in responding to AIC's request, they similarly miss the mark.  Although bad faith on the part of the Government can be relevant to whether a complainant substantially prevailed, see Weisberg, 745 F.2d at 1496, it is in no sense necessary.  The eligibility inquiry focuses on whether a plaintiff obtained relief – i.e., his requested records – through litigation.  AIC has satisfied that inquiry here.  Whether the agency's initial shortcoming resulted from bad faith, laziness, or human error is of no moment.

B.  Entitlement

The Court now asks whether AIC is "entitled" to an award of fees.  In doing so, it again notes that Plaintiff does not seek fees for the hours it expended opposing Defendants' Second Motion for Summary Judgment.  The Court will thus limit its analysis to the preceding phase of the litigation.

The goal of the entitlement inquiry is to ensure that attorney fees are distributed in a manner consistent with the purpose of FOIA's fee provision, which "'was not enacted to provide a reward for any litigant who successfully forces the government to disclose information it wished to withhold.'"  Davy, 550 F.3d at 1158 (quoting Nationwide Bldg. Maint.,

Inc. v. Sampson, 559 F.2d 704, 711 (D.C. Cir. 1977) (citing S. REP. NO. 93-854, at 17 (1974))).

Instead, it serves the "more limited purpose" of "remov[ing] the incentive for administrative

resistance to disclosure requests based not on the merits of exemption claims, but on the

knowledge that many FOIA plaintiffs do not have the financial resources or economic

incentives to pursue their requests through expensive litigation.'" Id. (quoting Nationwide, 559

F.2d at 711 (citing S. REP. NO. 93-854, at 17)).

With this purpose in mind, the Court must make a determination as to attorney-fee

entitlement by considering at least four different factors: "(1) the public benefit derived from the

case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the

records; and (4) the reasonableness of the agency's withholding of the requested documents."

Id. at 1159; see also Tax Analysts v. Dep't of Justice, 965 F.2d 1092, 1093 (D.C. Cir. 1992);

Negley, 818 F. Supp. 2d at 72.  No one criterion is dispositive, see Davy, 550 F.3d at 1159, and

"[t]he sifting of those criteria over the facts of a case is a matter of district court discretion."

Tax Analysts, 965 F.2d at 1094 (citing Church of Scientology v. Harris, 653 F.2d 584, 590

(D.C. Cir. 1981)).  The Court here will begin with the second and third factors, then move to the

first, and finish with the fourth.

### 1. *Factors Two and Three*

Factors (2) and (3) – the "commercial benefit" and "plaintiff's interest" factors, which

"are closely related and often considered together" – favor AIC.  Tax Analysts, 965 F.2d at

1095.  Plaintiff is a nonprofit organization whose "mission is to educate the American public

about immigrants' contributions to American society, to promote sensible and humane

immigration policy, and to advocate for the just and equitable enforcement of immigration

laws."  Compl., ¶ 8; see EPIC I, 811 F. Supp. 2d at 235 ("Fee recovery is often appropriate . . .

when the plaintiff is a nonprofit public interest group.").  In keeping with its mission, AIC has

long focused on access-to-counsel issues.  Specifically, it "educate[s] the immigration bar about

the relevant laws, advocat[es] for fair standards and procedures to remedy ineffective assistance

of counsel, and encourag[es] better access to counsel in proceedings before DHS and its

agencies, including CBP."  Id.  Plaintiff's FOIA request in this case – which sought information

about individuals' access to counsel during their interactions with federal immigration

authorities – sprung directly from these public-minded aspirations.

        AIC, moreover, disseminates to the public the records it acquires through FOIA requests.

See, e.g., Mot. at 9 ("Plaintiff summarized, indexed, and posted Defendants' documents on its

website, allowing the public to access and examine these documents free of charge.").  As an

entity that "'gathers information of potential interest to a segment of the public, uses [its]

editorial skills to turn the raw materials into a distinct work, and distributes that work to an

audience,'" AIC is "among those whom Congress intended to be favorably treated under

FOIA's fee provision."  Davy, 550 F.3d at 1161-62 (quoting Tax Analysts, 925 F.2d at 1095);

see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec. (EPIC III), 999 F. Supp. 2d 61,

69 (D.D.C. 2013) ("These [second and third] factors also favor non-profit organizations like

EPIC, which aim to ferret out and make public worthwhile, previously unknown government

information – precisely the activity that FOIA's fees provision seeks to promote.") (internal

quotation marks omitted).

        The Government essentially concedes that both of these factors favor Plaintiff.  It does

not address the third factor at all, and it makes only the most cursory of arguments with regard

to the second.  Notwithstanding the fact that AIC has disseminated the material free of charge

on its website, Defendants maintain that it could potentially garner a commercial benefit from

its request.  See Opp. at 16 n.8.  They point to the appeal for donations posted on AIC's website,

arguing that the requested records might drive increased traffic to the site and thus bolster

donations.  See id.  It is precisely because Plaintiff is a nonprofit organization that does not

commercially benefit from its work, however, that it must solicit donations on its website in

order to survive.  A possible increase in such donations as a result of a successful, interest-

provoking FOIA request does not constitute a commercial benefit or a "private advantage,"

Davy, 550 F.3d at 1160, that weighs against granting a fee award.  The Court would be remiss,

moreover, if it failed to note that Defendants' current stance flatly contradicts the position it

took when granting Plaintiff's request for a fee waiver.  There, the agency expressly found that

"AIC did not have a commercial interest that would be furthered by release of the information

requested."  Suzuki Letter at 8.  That earlier conclusion was the correct one, and the Court

affirms it here.

> 2.  *Factor One*

Like factors two and three, the first factor – the "public benefit derived from the case" –

also militates in AIC's favor.  This factor "requires consideration of both the effect of the

litigation for which fees are requested and the potential public value of the information sought."

Davy, 550 F.3d at 1159.  In evaluating this criterion, it is important to note that "[t]he simple

disclosure of government documents does not satisfy the public interest factor."  Alliance for

Responsible CFC Policy, Inc. v. Costle, 631 F. Supp. 1469, 1471 (D.D.C. 1986) (citing Fenster

v. Brown, 617 F.2d 740, 744 (D.C. Cir. 1979)).  Instead, the Court must determine whether "the

complainant's victory is likely to add to the fund of information that citizens may use in making

vital political choices."  Cotton v. Heyman, 63 F.3d 1115, 1120 (D.C. Cir. 1995) (quoting

Fenster, 617 F.2d at 744) (internal quotation marks omitted).

AIC's FOIA request concerned a matter of undeniable public import.  Plaintiff sought information on "policies regarding a noncitizen's access to counsel in interactions with [CBP and DHS]."  Creighton Letter at 1.  Immigration policy – including treatment of noncitizens seeking entry to this country – has long been at the forefront of the national conversation.  See generally, e.g., R.I.L-R v. Johnson, No. 15-11, 2015 WL 737117 (D.D.C. Feb. 20, 2015); Wil S. Hylton, The Shame of America's Family Detention Camps, N.Y. Times Magazine MM25 (February 8, 2015), available at http://www.nytimes.com/2015/02/08/magazine/the-shame-of-americas-family-detention-camps.html?_r=0 (describing conditions in family detention centers).  Access to counsel is a significant aspect of this discourse, and the requested documents were plainly intended to enlarge and inform that debate.  See EPIC III, 999 F. Supp. 2d at 68 (finding public benefit "was exceptional" because documents obtained were related "to a matter subject to an ongoing national debate: the tension between individual privacy interests and the national-security needs of our government in the digital age").

The Government released over 300 documents as a result of Plaintiff's request.  See Mot. at 2; Opp. at 6.  AIC then summarized those documents and posted them on its website, which receives more than 112,000 average monthly page views.  See Mot. at 7.  Such widespread dissemination of the fruits of the request cements a public-benefit finding here.  See Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec. (EPIC II), 892 F. Supp. 2d 28, 50-51 (D.D.C. 2012) (holding that public-benefit factor weighed in favor of FOIA plaintiff when records were posted to plaintiff's website and in its newsletter that over 8000 people received); see also Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice (CREW I), 820 F. Supp. 2d 39, 46-47 (D.D.C. 2011) (noting that availability of requested documents on plaintiff's various websites weighed in favor of public-benefit factor).

Defendants attempt to circumvent this relatively straightforward conclusion by arguing that the requested documents are of interest only to a "relatively small segment of the population" – noncitizens, "whose specific numbers cannot be quantified," and immigration attorneys, "a small community of attorneys practicing in a niche area of the law."  Opp. at 14. The Court disagrees.  As previously explained, the issue of noncitizens' access to counsel is an important component of a vigorous political debate over immigration and is, therefore, of widespread public interest.  Perhaps even more telling are the Government's prior inconsistent statements.  In granting AIC's request for a fee waiver, CBP recognized that "[i]mmigration has been and continues to be a significant issue in the United States," that AIC has "expertise in the subject area and the ability and intention to effectively disseminate the information to the public," and that the requested disclosures "were likely to contribute to the understanding of a reasonably broad audience of persons interested in immigration issues."  Suzuki Letter at 6-7. Defendants cannot retreat from this conclusion in order to avoid paying attorney fees.

       3.  *Factor Four*

The fourth factor – the reasonableness of the agency's withholding – is a closer call.  This factor requires consideration of "whether the agency's opposition to disclosure 'had a reasonable basis in law,' Tax Analysts, 965 F.2d at 1096, and whether the agency 'had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior,' LaSalle Extension, 627 F.2d [481,] 486 [(D.C. Cir. 1980)]."  Davy, 550 F.3d at 1162.  Significantly, the burden remains with the agency: "The question is not whether [Plaintiff] has affirmatively shown that the agency was unreasonable, but rather whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material until after [Plaintiff] filed suit."  Id. at 1163.

The Court recognizes that CBP expended a significant amount of effort and resources searching through documents, particularly after the initial round of summary-judgment briefing. It might even be fair to say that – after withdrawing its initial Motion – the Government surpassed the call of duty in searching for documents that might be of interest to Plaintiff.  See ECF Nos. 34, 36 (status reports detailing Defendants' search efforts).  For example, at the request of Plaintiff's counsel, Defendants conducted additional searches at ten ports of entry chosen by AIC, using six specific search terms identified by the organization.  See Opp. at 11.

This yeoman's work, however, is immaterial to CBP's failure to cast a wider net in response to Plaintiff's initial request.  The agency has not satisfactorily explained why its earlier efforts were so cabined, nor shown "beyond material doubt" that those limited searches were "reasonably calculated to uncover all relevant documents."  Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 325-26 (D.C. Cir. 1999) (internal citation and quotation marks omitted). Indeed, in justifying its initial decision to search only three CBP component offices, it said only that "responsive records were likely to have been created and be maintained" in those offices, not that they were the only locations likely to contain such records.  See Suzuki Letter at 10; Suzuki Decl., ¶ 14; see Elkins v. Fed. Aviation Admin., No. 14-476, 2014 WL 4243152, at *4 (D.D.C. Aug. 28, 2014) ("[A]n agency's attestation that it has searched all offices likely to contain responsive records is sufficient justification for its decision to limit its search to certain locations.") (emphasis added).

In any event, the Court need not dwell too long on the reasonableness of Defendants' actions.  The D.C. Circuit "has repeatedly asserted that 'the court must be careful not to give any particular factor dispositive weight.'"  Campaign for Responsible Transplantation v. Food & Drug Admin., 593 F. Supp. 2d 236, 244 (D.D.C. 2009) (quoting Sampson, 559 F.2d at 714).

The only time when the fourth factor would control is "when the agency has demonstrated that it had a lawful right to withhold disclosure." <u>Davy</u>, 550 F.3d at 1159; <u>see also</u> <u>Chesapeake Bay Found., Inc. v. Dep't of Agric.</u>, 11 F.3d 211, 216 (D.C. Cir. 1993) ("[T]here can be no doubt that a party is not entitled to fees if the Government's legal basis for withholding requested records is correct."), <u>abrogated in part on other grounds by</u> <u>Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Resources</u>, 532 U.S. 598, 601-02 (2001).  AIC's success on the first three factors, combined with some degree of success on the fourth, is more than sufficient to establish its entitlement to fees.  <u>See</u> <u>CREW I</u>, 820 F. Supp. 2d at 47-48.

 C. <u>Calculating Fees</u>

 Having determined that AIC is entitled to an award of attorney fees, the Court must now calculate the precise size of that award.  The "usual method of calculating reasonable attorney's fees is to multiply the hours reasonably expended in the litigation by a reasonable hourly fee, producing the 'lodestar' amount." <u>Bd. of Trs. of Hotel and Rest. Emps. Local 25 v. JPR, Inc.</u>, 136 F.3d 794, 801 (D.C. Cir. 1998) (citing <u>Pennsylvania v. Delaware Valley Citizens' Council for Clean Air</u>, 478 U.S. 546, 564 (1986)).  That number may then be adjusted to reflect "the significance of the overall relief obtained by the plaintiff." <u>Judicial Watch, Inc. v. U.S. Dep't of Justice</u>, 774 F. Supp. 2d 225, 233 (D.D.C. 2011).

 Plaintiff requests $106,499.90 in fees for the underlying litigation.  It further requests $24,131.25 in "fees on fees" – <i>i.e.</i>, for work on this Motion for Attorney Fees.  Defendants take issue with both the hourly rates assessed and the number of hours billed.  The Court considers each variable in turn and then forges ahead with the necessary computations.

   1. *Reasonable Hourly Rates*

Almost a dozen attorneys represented Plaintiff in this case.  In addition to three in-house

counsel who worked on the matter, AIC received *pro bono* representation from eight attorneys

employed by a national law firm, Dorsey & Whitney LLP.  Those attorneys have provided a

table of their normal, undiscounted hourly rates for the years worked on this matter:

| Table A: Established Dorsey Rates | | | | | | |
|---|---|---|---|---|---|---|
| Timekeeper | Law School Graduation | 10/2010-9/2011 | 10/2011-9/2012 | 10/2012-9/2013 | 10/2013-9/2014 | 10/2014-9/2015 |
| Creighton Magid (Partner) | 1987 | 555 | 570 | 595 | 620 | 650 |
| Theresa Bevilacqua (Partner) | 2001 | 390 | 400 | 410 | 430 | 455 |
| Michelle Grant (Partner) | 2001 | 390 | 400 | 410 | 440 | 465 |
| Erin Davenport (Associate) | 2008 | 255 | 275 | 305 | 340 | 375 |
| Shannon Bjorklund (Associate) | 2009 | 235 | 265 | 295 | 340 | 370 |
| Andrew Brantingham (Associate) | 2009 | 235 | 265 | 295 | 340 | 370 |
| Michael Stinson (Associate) | 2011 | 210 | 235 | 260 | 295 | 325 |
| Katherine Arnold (Associate) | 2013 | -- | -- | -- | 250 | 280 |

Mot., Exh. A (Declaration of Michelle Grant), ¶¶ 6-8.  Defendants do not oppose their

application in this case.  <u>See</u> Opp. at 22 (Defendants "have no significant quarrels about the

hourly rates Dorsey has proposed.").  The Court, accordingly, adopts those rates wholesale.  <u>See</u>

<u>Laffey v. Northwest Airlines, Inc.</u>, 746 F.2d 4, 24 (D.C. Cir. 1984) (applying a firm's

"established rates" because they "represent the opportunity cost of what the firm turned away in

order to take the litigation"), overruled on other grounds by Save Our Cumberland Mountains v. Hodel, 857 F.2d 1516, 1524 (D.C. Cir. 1988) (en banc).

Lest one believe that amity prevails on the rate issue, the parties hotly dispute the appropriate hourly rates for the trio of attorneys from AIC who worked on this case. To calculate fees for public-interest attorneys who have no customary hourly rates, courts often look to prevailing market rates in the community. See Blum v. Stenson, 465 U.S. 886, 896-97 (1984); Local 25, 136 F.3d at 800-01. In fleshing out those rates, this Circuit has frequently employed the Laffey Matrix, "a schedule of fees based on years of attorney experience that was developed in Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354 (D.D.C. 1983), rev'd on other grounds, 746 F.2d 4 (D.C. Cir. 1984)." ACLU v. Dep't of Homeland Sec., 810 F. Supp. 2d 267, 277 (D.D.C. 2011) (quoting Judicial Watch, 774 F. Supp. 2d at 232).

This merely frames, but does not resolve, the issue. That is because the parties in this case advance dueling matrices. AIC argues that its in-house attorneys should be awarded fees based on an updated Laffey Matrix developed by economist Dr. Michael Kavanaugh. See Reply at 14, 20. To build his matrix, Kavanaugh took a sample of legal-services costs from 1989 and adjusted them using the Legal Services Index (LSI) constructed by the Department of Labor. See id.; see also Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice (CREW II), No 11-1021, slip op. at 15-16 (D.D.C. Oct. 24, 2014). In recent years, various courts in this district (including this one) have approved use of this so-called "LSI Matrix." See Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice, No. 11-754, slip op. at 9-10 (D.D.C. Aug 4, 2014) ("[T]his Court has, for many years, accepted the appropriateness of and greater accuracy of rates based on the LSI Index [of the Laffey matrix]."); Salazar v. Dist. of Columbia, 991 F. Supp. 2d 39, 48 (D.D.C. Jan. 30, 2014) ("[T]he LSI-adjusted matrix . . .

appears to be a more accurate reflection of the cost of legal services both in this community and nationwide."); <u>accord</u> <u>Eley v. Dist. of Columbia</u>, 999 F. Supp. 2d 137,154 (D.D.C. Nov. 20, 2013).

Defendants counter, however, that the LSI-indexed version of the <u>Laffey</u> Matrix results in "overly generous rates, comparable to or exceeding the very top rates in the D.C. legal market." Opp. at 23 (pointing out that "the hourly rate for the work one AIC attorney performed, from June 2013 to the present, is from $121 to $139 more than the highest rate for the senior partner at the Dorsey law firm who worked on this case, and who has over twenty-five years of experience"). They urge the Court to look instead to the <u>Laffey</u> Matrix maintained by the U.S Attorney's Office for the District of Columbia. This matrix is based on 1982 rates and adjusted using the "All-Items Regional [Consumer Price Index]," also constructed by the Department of Labor. <u>See</u> <u>CREW II</u>, slip op. at 16. According to Defendants, this CPI Matrix "better tracks the actual inflation of the legal market for complex federal litigation in D.C." Opp. at 25. They further note that the U.S. Attorney's Office, which prepares and issues the CPI matrix, was not involved in the cases adopting the LSI Matrix, and "it appears that critical information" was thus "not presented to the Court in those cases." <u>Id.</u>

Thankfully, this hornets' nest need not be poked here. Instead, in the interest of both efficiency and fairness, the Court will treat Dorsey's rates as a yardstick by which to gauge suitable rates for the in-house AIC attorneys. <u>See</u> <u>Rosie D. ex rel. John D. v. Patrick</u>, 593 F. Supp. 2d 325, 330-31 (D. Mass. 2009) ("[T]he court will award the rates actually requested by the WilmerHale lawyers. . . . The hourly rates established for the WilmerHale group provide a benchmark for the hourly rates applicable to the public interest attorneys who also worked on the case."). Dorsey's rates reflect a private firm's market-based assessment of the value of its time

for the precise work performed in this case, and they have been universally endorsed by Plaintiff,

Defendants, and even other courts.  There is no cause to ignore this tailor-made framework for

appropriate hourly rates.

So, to calculate reasonable hourly rates for Melissa Crow, an AIC attorney who

graduated law school in 1994, see Mot., Exh. B (Declaration of Melissa Crow), ¶ 13, the Court

averages the rates charged by Dorsey's Creighton Magid (a 1987 graduate) and Theresa

Bevilacqua (a 2001 graduate).  See Grant Decl., ¶ 9.  AIC's Beth Werlin, who graduated in 2000,

see Crow Decl., ¶ 13, is entitled to the same hourly rates as Dorsey's Michelle Grant, an attorney

of roughly comparable experience.  See Grant Decl., ¶ 9.  And AIC's Kristin MacLeod-Ball, who

graduated in 2012, see Crow Decl., ¶ 13, will be assigned the same rates as Dorsey's Michael

Stinson.  See Grant Decl., ¶ 9.  Those adjusted rates are memorialized in the following table:

| Table B: AIC Adjusted Rates | | | | | | |
|---|---|---|---|---|---|---|
| Timekeeper | Law School Graduation | 10/2010-9/2011 | 10/2011-9/2012 | 10/2012-9/2013 | 10/2013-9/2014 | 10/2014-9/2015 |
| Melissa Crow | 1994 | 472.5 | 485 | 502.5 | 525 | 552.5 |
| Beth Werlin | 2000 | 390 | 400 | 410 | 440 | 465 |
| Kristin MacLeod-Ball | 2012 | -- | -- | 260 | 295 | 325 |

## 2. *Hours Reasonably Expended*

Defendants next raise a pastiche of objections to the number of hours billed by AIC's

attorneys.  They argue that the number of attorneys involved in the case was "excessive," and

that the billing records reflect duplication of effort.  See Opp. at 33.  They further maintain that

Plaintiff should not recover for work performed at the administrative stage; for work related to

*pro hac vice* motions; or for the review of documents produced in response to its FOIA request.

See id. at 35-36, 40.  In similar fashion, they contend that certain billing entries are insufficiently

detailed, that Plaintiff's attorneys logged too much time drafting certain filings, and that the fees

sought are simply too high in light of AIC's settlements with other agencies.  See id. at 38, 41-

45.  Finally, they assert that the number of hours expended in litigating the issue of attorney fees

– i.e., fees on fees – was unreasonable.  See id. at 35.

The Court takes up these objections seriatim.  Ultimately, it finds some of Defendants'

broader concerns to be justified and reduces the fee award accordingly.  It declines, however, to

engage in the kind of "nitpicking" invited by CBP's smaller-scale objections.  CREW I, 825 F.

Supp. 2d at 229; accord Baker v. D.C. Public Schools, 815 F. Supp. 2d 102, 109, 2011 WL

4507251, at *4 (D.D.C. 2011) (citing Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675

F.2d 1319, 1337-38 (D.C. Cir. 1982)).

### a.  Number of Attorneys

As noted, eight attorneys from Dorsey and another three from AIC participated in this

litigation.  That number, Defendants say, is patently excessive.  See Opp. at 33.  They are

correct.  Nothing about this case is so complex as to require so many hands on deck; on the

contrary, having eleven attorneys working on and billing their time in a non-extraordinary FOIA

case seems beyond the pale.  Overstaffing this case, moreover, led to overbilling. Plaintiff's time

sheets are replete with conferences among co-counsel attempting to coordinate case strategy and

instances in which multiple attorneys billed for performing the same task.  See, e.g., Grant Decl.,

Exh. A (entries dated 10/19/11 and 5/20/13).  This redundancy in attorney structure must be

accounted for in determining an appropriate fee award.

It is unnecessary – and a waste of judicial resources – however, to scrutinize each

individual billing entry.  See Copeland, 641 F.2d at 903.  Instead, the Court will reduce AIC's

total fee award by 25% as a commensurate counterweight to the surplus of attorneys.  See, e.g.,

<u>Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. EPA</u>, 169 F.3d 755, 761 (D.C. Cir. 1999) (*per curiam*) (reducing sought fees by approximately 50%, citing as one reason the "unusually high number of attorneys reviewing and editing briefs"); <u>Smith v. D.C.</u>, 466 F. Supp. 2d 151, 158-59 (D.D.C. 2006) (concluding that a 25% across-the-board reduction in fees was appropriate to account, in part, for "significant overstaffing").

          b.  Administrative Work, *Pro Hac Vice* Motions, and Document Review

In its Motion, Plaintiff sought fees for work performed at the administrative stage of litigation, in addition to work associated with filing *pro hac vice* motions.  In response to Defendants' objections, AIC conceded both requests.  <u>See</u> Reply at 23.  The Court will follow suit and exclude those amounts.

On the other hand, Plaintiff preserved its request for fees incurred in reviewing the records ultimately produced by CBP.  It claims that such compensation is warranted because it "was forced to determine whether the documents were relevant to its request, whether Defendants' search terms were yielding adequate results, and whether Defendants' asserted exemptions were appropriate."  Reply at 21.  This Court has held, however, that a "[p]laintiff is not entitled to recover for time spent reviewing the documents it instituted [a] lawsuit to obtain." <u>CREW I</u>, 825 F. Supp. 2d at 231.  FOIA provides that a plaintiff may recover "attorney fees and other <u>litigation</u> costs reasonably incurred in any <u>case</u>."  5 U.S.C. § 552(a)(4)(E)(i) (emphasis added).  This case concerned AIC's demand for and CBP's nonproduction of certain documents.  AIC received the relief it sought when the documents were produced, and "[t]he time [it] expended reviewing the documents . . . [was] a post-relief activity, separate from the litigation." <u>CREW I</u>, 825 F. Supp. 2d at 232 (internal quotation marks omitted); <u>see also</u> <u>Steenland v. CIA</u>, 555 F. Supp. 907, 911 (W.D.N.Y. 1983) (compensation for work performed after records were

released "would assess a penalty against defendants which is clearly unwarranted").  Indeed,

Plaintiff would have had to expend this time had CBP timely produced the documents without

litigation; the cost of reviewing documents produced in response to a FOIA request – to see if

they are responsive or for other reasons – is simply the price of making such a request.  The

Court will thus deduct these charges as well.

> c.  Block Billing, Excessive Hours on Filings, and Settlement Evidence

Defendants challenge the hours billed in the underlying litigation in three further

respects.  None holds water.  First, they argue that Plaintiff provided insufficient information or

engaged in "block billing" practices in "several" entries.  See Opp. at 39, 44.  A survey of

Plaintiff's billing entries reflects, however, that the vast majority are appropriately detailed and

allow the Court to discern "with a high degree of certainty" the work for which the attorney is

requesting compensation.  See Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 970, 975 (D.C.

Cir. 2004).  No reduction is warranted to account for a handful of entries that could have perhaps

benefitted from slightly more detail.

Second, Defendants argue that Plaintiff's attorneys spent an excessive amount of time

drafting certain filings.  Specifically, they take issue with the 19 hours logged on the Complaint

and the 73.75 hours spent on opposing the initial Motion for Summary Judgment.  See Opp. at

41-42.  The Court is loath to "'conduct a minute evaluation of each phase or category of

counsel's work.'"  Copeland v. Marshall, 641 F.2d 880, 903 (D.C. Cir. 1980) (quoting Lindy

Bros. Builders of Philadelphia v. Am. Radiator & Standard Sanitary Corp., 540 F.2d 102, 116

(3d Cir. 1976)).  Although the number of hours expended here seems slightly high at first blush,

it is not outrageously so.  Because the Government vigorously and substantively litigated this

case, moreover, the Court is satisfied by Plaintiff's representations that the time spent preparing

each filing was reasonably necessary.   Any overbilling that resulted from overstaffing and redundancy, furthermore, has already been accounted for by the 25% reduction authorized in Section II.C.2.a, *supra*.

Third, the Government notes that Plaintiff filed a nearly identical FOIA request against U.S. Citizen and Immigration Services (USCIS) and Immigration and Customs Enforcement (ICE).   In the USCIS matter, the parties ultimately settled fees and costs for $45,000, and, in the ICE matter, the parties settled for $35,000.   These amounts, claims the Government, are evidence that the threefold increase in Plaintiff's request here is "excessive and unreasonable."   Opp. at 45.   Defendants' argument compares apples to oranges.   Of course, parties routinely settle cases for less than their true value – that is, at a discount – to account for the elimination of risk and uncertainty and energy expended that inhere in further litigation.   That is the very nature of settlement.   Here, Defendants were given numerous opportunities to settle this matter but rejected all of them, including AIC's most recent attempt after this Court issued its September 24, 2014, Opinion allowing briefing on fees to proceed.   See Reply, Exh. A (Second Declaration of Michelle Grant), ¶ 2.   The Government cannot now insist that any fee award be anchored to the amount Plaintiff settled for in other comparable cases.   AIC is entitled to seek all amounts reasonably billed.

### d.  Fees on Fees

Finally, Defendants challenge the hours Plaintiff logged in litigating the attorney fee issue – 52.05 – as unreasonably high.   In one major respect, the Court sides with the Government.   As noted above, see Part II.C.2.a, this entire case suffered from significant overstaffing, including AIC's motion practice on the issue of fees.   The 25% across-the-board haircut will, therefore, be applied to this aspect of Plaintiff's request as well.

25

Insofar as the Government asks that the hours associated with AIC's fees-on-fees work be further reduced, the Court disagrees.  Plaintiff initially sought to resolve the issue of attorney fees without further judicial involvement.  It was Defendants who – five months after the start of negotiations – reversed course and necessitated a motions practice on this issue.  In the course of those filings, they raised a variety of threshold and substantive objections to fees.  Plaintiff appropriately responded to those arguments, ultimately prevailing on many of them, as evidenced by this Opinion and the Court's prior Opinion granting AIC's Motion for a briefing schedule.  Aside from the issue of overstaffing, accordingly, the Court believes the hours Plaintiff spent litigating this issue were not excessive.

The Government last asserts that "to the extent the Court reduces Plaintiff's fee request for the bulk of the litigation, the fees charged for the attorneys' fee issue should be reduced as well."  Opp. at 35.  Courts in this District have concluded that awards of "fees on fees" should be reduced to exclude the amount of time spent unsuccessfully defending fee requests denied by the court.  See, e.g., Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Veterans Affairs, 1999 WL 33740260, at *5-*6 (D.D.C. 1999); see also Commissioner, I.N.S. v. Jean, 496 U.S. 154, 163 n.10 (1990) ("[F]ees for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation.").  "Where a lawsuit consists of related claims," however, "a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."  Hensley v. Eckerhart, 461 U.S. 424, 440 (1983).

Here, although the Court has not accepted Plaintiff's fee request on the underlying litigation in toto, it will not, as a consequence, further reduce Plaintiff's fees-on-fees request. Cf., e.g., EPIC I, 811 F. Supp. 2d at 240 (declining to reduce the fees-on-fees award despite

rejecting some of the plaintiff's requests for fees).  AIC prevailed on the two major issues raised

in the Motion for Attorney Fees: the questions of whether it was eligible for and entitled to fees

in the first place.  Of the issues on which it did not fully succeed, two of them – the rates for

AIC's in-house counsel and overstaffing – already have given rise to reduced fees on fees.  Only

a very small proportion of its briefing related to the other issues on which it did not prevail –

namely, the fees it requested for work associated with the administrative stage of litigation, *pro

hac vice* motions, and reviewing documents.  On close scrutiny of the record, therefore, the

Court concludes that no further reduction of "fees on fees" beyond the global 25% discount

explained above is appropriate.  The hours spent by Plaintiff were, on the whole, "reasonably

devoted to [its] request for fees," Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest., 771 F.2d

521, 528 (D.C. Cir. 1985); EPIC I, 811 F. Supp. 2d at 240, and would not constitute a "windfall"

for the attorneys.  Id. (citing Heard v. Dist. of Columbia, 2006 WL 2568013, at *19 (D.D.C.

2006)).

       3.  *Calculations*

      Having wrapped up the legal heavy lifting, the Court whips out its abacus and starts

tallying up the numbers.  It pauses to note that the parties have made this task decidedly

laborious.  AIC requests fees for eleven attorneys over the course of five years, with each

attorney claiming a unique set of yearly rates.  Aside from multiple appendices containing pages

upon pages of individual billing entries, Plaintiff has provided only the most general breakdown

of the hours its attorneys allocated to this litigation.  See Crow Decl., ¶¶ 14, 15.  It neither

aggregates the number of hours billed by a particular attorney at a particular rate, nor furnishes

the cumulative hours spent on particular objected-to tasks.  Defendants' itemizations, while

somewhat more helpful, are riddled with inaccuracies, some ridiculous.  See, e.g., Opp. at 40

("Crow's improper entries for time spent reviewing the documents received total $79,875."). As alluded to earlier, had judges desired to don green eyeshades instead of robes, they would not have gone to law school. Indeed, the judicial role is not to comb through endless lists of billing entries to gather data the parties have not seen fit to make clear. The Court will, therefore, do its best with the figures provided.

It begins with Plaintiff's fee request for work performed on the underlying litigation. That request totals $106,499.90, which breaks down further into $55,174.75 for the Dorsey attorneys and $51,325.15 for AIC's in-house counsel. See Crow Decl., ¶ 14; Grant Decl., ¶ 11. The latter sum reflects AIC's reliance on the LSI Matrix in designating hourly rates and, as such, must be reduced to reflect the Court's conclusion that Dorsey-scaled rates are more appropriate. See Part II.C.1, *supra*. Implementing these rate reductions, however, is somewhat challenging. As previously noted, in summarizing its billing for the Court, AIC did not catalog how many hours its attorneys billed *per annum – i.e.*, at a particular rate. Instead, it simply provided the total hours billed and total fees sought for each attorney:

| Table C: AIC's Requested Fees | | | |
|---|---|---|---|
| **Timekeeper** | **Hours Worked** | **Hourly Rate** | **Fees Sought** |
| Melissa Crow | 51.25 | $589 for 6/2010-5/2011<br>$609 for 6/2011-9/2012<br>$625 for 6/2012-5/2013<br>$771 for 6/2013-5/2014 | $33,423.25 |
| Beth Werlin | 9.9 | $609 for 6/2011-9/2012<br>$625 for 6/2012-5/2013 | $6,033.90 |
| Kristin MacLeod-Ball | 37.8 | $312 for 6/2012-5/2013<br>$320 for 6/2013-5/2014 | $11,868.00 |
| **Total Hours** | 98.95 | -- | $51,325.15 |

28

Crow Decl., ¶ 14.  Due to this unfortunate lapse, the Court cannot ascertain with precision the number of hours to be multiplied by each of the newly discounted rates in order to yield a reduced award.

To arrive at appropriate fees for AIC counsel, accordingly, the Court instead calculates each attorney's <u>average</u> reduction in rates and discounts her total fees sought by that percentage. So, for Crow, a comparison of the rates contained in Table B and Table C indicates that her rates are, on average, being reduced by 23%:

$$1 - (472.5/589 + 485/609 + 502.5/625 + 525/771) / 4 = 23\%$$

Her fees sought, $33,423.25, will be discounted proportionately, netting her **$25,735.90**.

Werlin's hourly rates are being reduced by 34%:

$$1 - (400/609 + 410/625) / 2 = 34\%$$

Discounting her fees sought ($6,033.90) by that percentage, she draws **$3,982.37**.

Finally, MacLeod-Ball's overall rate reduction averages to 12%:

$$1 - (260/312 + 295/320) / 2 = 12\%$$

Because she seeks $11,868.00 in fees, her reduced total amounts to **$10,443.84**.

Accounting for these discounts, Plaintiff's total requested fees – for both the Dorsey and AIC attorneys – add up as follows:

$$55,174.75 + 25,735.9 + 3,982.37 + 10,443.84 = \mathbf{\$95,336.86}$$

The Court must now exclude Plaintiff's requests for tasks not compensable.  With regard to *pro hac vice* work, the Dorsey attorneys billed $654.00 and AIC counsel Werlin requested $182.08.  <u>See</u> Opp. at 36-37.  The former amount will be excluded in full.  It would be unfair, however, to similarly deduct the whole of the latter sum, which is based on the fee scale

requested by the AIC attorneys, not the fees actually awarded.  The Court, therefore, discounts the figure charged to reflect Werlin's Dorsey-calibrated rates:

$$182.08 * (1 - .34) = \$120.17$$

For review of records, Defendants state that Crow billed $79,875, that MacLeod-Ball charged $5,442.40, and that Davenport sought $123.75.  See Opp. at 40.  The Government's representation as to Crow is facially absurd: it far exceeds the total amount requested by Crow for the whole of this litigation.  Nor does it appear – from a brief glance at the individual billing entries – that the figure provided is simply off by a factor of ten.  Once again, the Court will not sift through every record to extrapolate whence this figure derives.  Since it cannot deduct a plainly inappropriate amount, it will make no exclusion for time associated with Crow.  For MacLeod-Ball, as with Werlin, the Court marks down the amount charged in proportion to the amount by which her rates have been reduced:

$$5,442.40 * (1 - .12) = \$4,789.31$$

For Davenport, a Dorsey attorney receiving her requested rates, **$123.75** will be deducted in full.

As to work performed at the administrative stage of litigation, Defendants state that Dorsey attorneys requested **$1,670.50**.  See Opp. at 36.  The Court will exclude that amount in its entirety.

Subtracting down, Plaintiff is left with the following tab:

$$95,336.86 - 654 - 120.17 - 4,789.31 - 123.75 - 1,670.5 = \mathbf{\$87,979.13}$$

That amount is then discounted by 25% to reflect the general overstaffing of the case.  AIC is thus entitled to the following fees for work associated with the underlying litigation:

$$87,979.13 * (1-.25) = \mathbf{\$65,984.35}$$

As to the award for fees on fees, Plaintiff seeks a total of $24,131.25, which breaks down into $11,503.75 for AIC's in-house counsel and $12,627.50 for the Dorsey attorneys. Crow Decl., ¶ 15; Grant Decl., ¶ 12. The Court must again reduce the fees sought by AIC's in-house counsel to reflect the rates actually awarded. Crow requested $10,848.75. See Crow Decl., ¶ 15. Reducing that amount by 23% yields **$8,353.54**. Werlin, for her part, requested $655.00. See Crow Decl., ¶ 15. Discounted by 34%, she nets **$432.30**. MacLeod-Ball did not participate in the fees-on-fees component of the litigation.

These sums, in addition to the $12,627.50 requested by the Dorsey attorneys, are then similarly discounted by 25% to arrive at an appropriate fees-on-fees award:

$$(8,353.54 + 432.30 + 12,627.50) * (1 - .25) = \mathbf{\$16,060.01}$$

Finally, to calculate the total fee award (together with $469.06 in costs), the Court adds it all up as follows:

$$65,984.35 + 16,060.01 + 469.06 = \mathbf{\$82,513.42}$$

## III.    Conclusion

In sum, after all disputes have been resolved and all discounts have been applied, Plaintiffs sought $131,100.21 in attorney fees and will receive $82,513.42. A separate Order so stating shall issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: March 10, 2015